J-S68030-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: R.J.F., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: J.D.F., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 993 MDA 2017 |

Appeal from the Order Entered May 25, 2017
In the Court of Common Pleas of Columbia County
Orphans' Court at No(s): 166-OC-2016

BEFORE:   LAZARUS, J., DUBOW, J., and STRASSBURGER*, J.

MEMORANDUM BY DUBOW, J.:                    **FILED DECEMBER 01, 2017**

J.D.F. ("Father") appeals from the May 25, 2017 order entered in the Court of Common Pleas of Columbia County involuntarily terminating his parental rights to his natural daughter, R.J.F., born in May of 2013.  Because the certified record supports the orphans' court's decision, we affirm.[1]

**SUMMARY OF FACTS AND PROCEDURAL HISTORY**

On September 16, 2016, R.S. ("Maternal Grandfather") and D.S. ("Maternal Grandmother") (collectively, "Maternal Grandparents") filed a petition for the involuntary termination of Father's parental rights, a petition for the voluntary termination of the parental rights of C.C. ("Mother"), and a

---

* Retired Senior Judge assigned to the Superior Court.
[1] The Guardian Ad Litem ("GAL") has filed a brief in support of the subject order.

petition for adoption with respect to R.J.F. A hearing on the termination petitions occurred on March 30, 2017, during which the following witnesses testified: Maternal Grandfather; Mother; Father; and M.S., Father's girlfriend with whom he resides and shares a then seven-month-old child.[2]

In its opinion accompanying the subject order, the orphans' court set forth its findings of fact, which the testimonial evidence supports. As such, we adopt them herein. **See** Trial Court Opinion, 5/25/17, at 2-5.

By way of background, at the time of R.J.F.'s birth, Father and Mother, who never married, resided together in a mobile home adjacent to Maternal Grandparents' home. **Id.** at 3, ¶ 5. Columbia County Children & Youth Services ("CYS") removed R.J.F. from her natural parents' custody immediately upon birth because Mother was indicated as a perpetrator of medical neglect as a result of the death of another one of her children at four and one-half months old.[3] **See** Respondents' Exhibit 3. CYS placed R.J.F. in her Maternal Grandparents' custody when she was three days old. Trial Court Opinion, 5/25/17, at 3, ¶ 4; N.T., 3/30/17, at 7.

R.J.F. was adjudicated dependent, and CYS established a permanency goal of reunification with the natural parents. Father was required to satisfy

---

[2] The child of Father and M.S. is not a subject of this appeal.

[3] No criminal charges were filed against Mother as a result of the death of her child. **See** Petitioners' Exhibit 2. Further, Father is not the biological parent of the child who died. N.T., 3/30/17, at 47.

the following Family Service Plan ("FSP") objectives: participate in weekly one-hour supervised visits with R.J.F. at the CYS office; participate in drug and alcohol counseling and anger management counseling; and participate in parenting classes, *inter alia*. N.T., 3/30/17, at 47-48, 64.

In June of 2014, CYS closed R.J.F.'s dependency case, at which time Father had not satisfied the parenting class and anger management objectives. N.T., 3/30/17, at 62-64; Respondent's Exhibit 4. The trial court found that, upon closing the dependency case, CYS "officially placed R.J.F. with [Maternal] Grandparents as custodians. . . ." Trial Court Opinion, 5/25/17, at 3, ¶ 4.

Father's and Mother's relationship ended in late 2014, at which time Father continued to live in the mobile home adjacent to Maternal Grandparent's home, and Mother relocated to another residence in Columbia County, which was not adjacent to Maternal Grandparents' home. Trial Court Opinion, 5/25/17, at 3, ¶ 6; N.T., 3/30/17, at 12.

In July of 2014, Father initiated, *pro se*, a custody action against Maternal Grandparents wherein he requested primary physical custody of R.J.F. The case was assigned to a custody master, and the trial court adopted the master's recommendations. In September of 2014, the court issued an *interim* custody order, which granted Maternal Grandparents primary physical custody and Father partial physical custody for an unspecified amount of time to be supervised by Maternal Grandfather. **See** Petitioner's Exhibit 2. On

December 30, 2014, following a second hearing before the master, the court issued an *interim* order, which granted the parties shared legal custody, Maternal Grandfather primary physical custody, and Father partial physical custody every Wednesday and Thursday evening for two hours to be supervised by Maternal Grandfather.[4] *Id.* On March 26, 2015, the court issued an *interim* custody order which directed as follows:

> Father may seek additional periods of physical custody, or unsupervised physical custody after securing a residence to receive unsupervised contact. Father must provide the Master with correspondence evidencing that he is capable of unsupervised contact without endangering the child. The testimony must be issued from his counselor or psychiatrist and must be in writing or by telephone at the next conference.

Respondent's Exhibit 1.

Soon thereafter, in April of 2015, Maternal Grandfather filed a Protection from Abuse ("PFA") petition against Father. Trial Court Opinion, 5/25/17, at 4, ¶ 8. In addition, at a time unspecified in the record, Mother filed a PFA petition against Father. The trial court held an evidentiary hearing on the petitions on May 27, 2015, during which Father participated *pro se*. **See** Respondent's Exhibits 2, 7.

On May 29, 2015, the court issued two separate PFA orders against Father, both of which had a two-year expiration period. The first PFA order directed that Father refrain from contact with Mother. The second PFA order directed that Father refrain from contact with Maternal Grandparents and

---

[4] The *interim* order also granted Mother partial physical custody as agreed upon by her and Maternal Grandfather. **See** Petitioner's Exhibit 2.

R.J.F. Further, the second PFA order awarded Maternal Grandfather temporary exclusive custody of the child. *See* Respondent's Exhibit 2. The order provided, in relevant part:

**5.** . . .

**THIS ORDER SUPERSEDES ANY PRIOR ORDER RELATING TO CHILD CUSTODY.**

**Custody provisions of paragraph 5 of this order are temporary. Either party may initiate custody proceedings pursuant to the custody statute act 23 Pa.C.S. § 5321 et seq. Any valid custody order entered after the final Protection from Abuse order supersedes the custody provisions of this order.**

*Id.* at ¶ 5. It is important to note that the first PFA order regarding Mother did not include this custody provision. *See* Respondent's Exhibit 7.

Father's last contact with R.J.F. was in April of 2015, when the PFA petitions were filed. Trial Court Opinion, 5/25/17, at 4, ¶ 12. The orphans' court found that Father "thought that the PFA [order] prohibited him from seeing the child for two years. He thought that if he tried to see the child, he would be in violation of the order. He said he intended to start seeing the child in May 2017." *Id.* at ¶ 13.

By order dated May 25, 2017, and entered on May 26, 2017, the orphans' court involuntarily terminated Father's parental rights pursuant to 23

Pa.C.S. § 2511(a)(1) and (b).[5]  Father timely filed a notice of appeal and a

concise statement of errors complained of on appeal pursuant to Pa.R.A.P.

1925(a)(2)(i) and (b).[6]  The orphans' court filed its Rule 1925(a) opinion on

July 13, 2017.

**ISSUES ON APPEAL**

On appeal, Father presents the following issues for our review:

A. Did the [orphans'] [c]ourt commit an error of law and abuse of discretion when it determined the burden of clear and convincing evidence was met in terminating the parental rights of [Father] pursuant to 23 Pa.C.S. § 2511 et[] seq.?

B. Did the [orphans'] [c]ourt commit an abuse of discretion and an error of law when it determined that Father displayed a settled purpose to relinquish his rights as Father for a period of six (6) months pursuant to 23 Pa.C.S. § 2511 et[] seq.?

C. Did the [orphans'] [c]ourt commit an error of law in failing to consider the fact that Father never received the [PFA] [o]rder that included the minor child and important language that explained his rights regarding custody, resulting in his extended time away from minor child?

D. Did the [orphans'] [c]ourt commit an error of law in failing to consider case law that calls for careful scrutiny when analyzing

---

[5] In its opinion accompanying the subject order, the orphans' court set forth Section 2511(a)(1) and (2) as potential grounds for termination.  Trial Court Opinion, 5/25/17, 6.  However, we observe that the Maternal Grandparents' petition requested termination of Father's parental rights pursuant to Section 2511(a)(1) and not (a)(2).  In any event, the court involuntarily terminated Father's parental rights pursuant to Section 2511(a)(1) and (b) only.

[6] By order dated May 25, 2017, and entered on July 13, 2017, the orphans' court voluntarily terminated Mother's parental rights to R.J.F.  Mother did not file a notice of appeal nor is she a party to this appeal.

[p]arental [t]ermination [p]etitions that include a [p]ro [s]e litigant with a [PFA] [o]rder that includes the minor child?

E. Did the [orphans'] [c]ourt commit an error of law and abuse of discretion when it determined that Father never attempted to economically benefit the minor child?

F. Did the [orphans'] [c]ourt err by failing to take into consideration that Mother's [s]tipulation to [t]erminate her parental rights is a misapplication of case law, specifically, *In re: Adoption of M.R.D.*, 145 A.3d 1117 (Pa. 2016)?

Father's brief at 4-5.

**LEGAL ANALYSIS**

We consider Father's issues according to the following standard.

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S. § 2101-2938, which requires a bifurcated analysis.

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his

or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

Instantly, orphans' court terminated Father's parental rights pursuant to Section 2511(a)(1) and (b), which provides as follows.

**(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

. . .

**(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(1), (b).[7]

This Court has explained:

To satisfy the requirements of section 2511(a)(1), the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties. *In re Adoption of R.J.S.*, 901 A.2d 502, 510 (Pa. Super. 2006). In addition,

> Section 2511 does not require that the parent demonstrate both a settled purpose of relinquishing parental claim to a child and refusal or failure to perform parental duties. Accordingly, parental rights may be terminated pursuant to [s]ection 2511(a)(1) if the parent either demonstrates a settled purpose of relinquishing parental claim to a child or fails to perform parental duties.

*In re Adoption of Charles E.D.M.*, 550 Pa. 595, 708 A.2d 88, 91 (Pa. 1998).

> Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

*Id*. at 92 (citation omitted).

---

[7] Father did not challenge the termination of his parental rights pursuant to subsection 2511(b) in his concise statement, nor does he include such a challenge in his statement of questions involved, or in the argument section of his brief. Therefore, we conclude that any challenge to Section 2511(b) is waived. *See In re M.Z.T.M.W.*, 163 A.3d 462, 466 (Pa. Super. 2017) (holding that the appellant waived her challenge to Section 2511(b) by failing to include it in her concise statement and statement of question involved).

*In re Z.S.W.*, 946 A.2d 726, 730 (Pa. Super. 2008).

> This Court has defined parental duty as follows:
>
> There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this court has held that the parental obligation is a positive duty which requires affirmative performance.
>
> This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.
>
> Because a child needs more than a benefactor, parental duty requires that a parent exert himself to take and maintain a place of importance in the child's life.
>
> Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with . . . her physical and emotional needs.

*In re B.,N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004).

Instantly, Father's first, second, and third issues on appeal are interrelated, and so we review them together. Father asserts that he was served with the first PFA order regarding Mother, but that he was not served with the second PFA order regarding Maternal Grandparents and R.J.F.

However, Father asserts that he presumed the first PFA order was applicable to the Maternal Grandparents and R.J.F. as well as to Mother since both PFA petitions were consolidated in the May 27, 2015 evidentiary hearing. Because he alleges not being served with the second PFA order, Father argues he was unaware of the provision setting forth that he may seek reinstatement of his physical custody of R.J.F. *See* Respondent's Exhibit 2, ¶ 5.

Father argues that his lack of contact with R.J.F. since April of 2015, was a result of following the prohibitions set forth in the first PFA order and not because he had a settled purpose of relinquishing his parental rights. In support of his argument, Father references testimony by him and his girlfriend, M.S., that he purchased gifts for R.J.F. since April of 2015, which he plans to give her upon the expiration of the PFA order, and that he set up a bedroom for R.J.F. in his home because he plans to seek custody upon the expiration of the PFA order. *See* N.T., 3/30/17, at 54-55, 88-89. For these reasons, Father argues that the orphans' court abused its discretion in terminating his parental rights pursuant to Section 2511(a)(1).

In its opinion accompanying the subject order, the orphans' court found that "Father's explanation for his lack of contact [with R.J.F.] for the last two years is not rational and is very questionable." Trial Court Opinion, 5/25/17, 5, ¶ 19. In its Rule 1925(a) opinion, the court explained as follows.

> [Father] alleges that he did not receive the second [PFA] order but thought that the first order prohibited him from contacting the child. That makes no sense since the first order did not mention

the child[,] and [Father] knew that the child was in the custody of the [M]aternal [G]randparents.

Trial Court Opinion, 7/13/17, at 4. As such, the court concluded that "Father has evidenced a settled purpose of relinquishing his parental claim to R.J.F. He has refused and, particularly, *failed to perform parental duties*." Trial Court Opinion, 5/25/17, at 9 (emphasis in original).

The testimonial evidence supports the court's credibility determination against Father in this regard as follows. The first PFA order shows Father's mailing address at Bloomsburg Hospital, where he had been involuntarily committed in March or April of 2015. Respondent's Exhibit 7; Trial Court Opinion, 5/25/17, at 3, ¶ 7; N.T. 3/30/17, at 73. Father testified, "I had a nervous breakdown and I was actually out [of Bloomsburg Hospital] the next day." N.T., 3/30/17, at 74. The second PFA order shows Father's mailing address at a location in Berwick, Pennsylvania, where Father acknowledged he was residing on the date of the second PFA order. Respondent's Exhibit 2; N.T., 3/30/17, at 84. On cross-examination by Maternal Grandparents' counsel, Father testified as follows:

> Q. [T]he weird thing about this is that you . . . claim you got the PFA [order] listed as Bloomsburg Hospital even though you weren't living there and you didn't get the one at your address even though you were living there, is that correct?
>
> A. Yes.

N.T., 3/30/17, at 84-85.

Based on the foregoing, to the extent the court's termination of Father's parental rights under Section 2511(a)(1) was based on its credibility determination against Father regarding service of the second PFA order, we will not disturb it. *See In re T.S.M.*, *supra* (stating that appellate courts are required to accept the credibility determinations of the trial court if they are supported by the record). Indeed, by failing to initiate another custody proceeding as set forth in the second PFA order, Father did not exercise reasonable firmness in resisting the obstacles placed in the path of maintaining his parent-child relationship with R.J.F. *See In re B.,N.M.*, *supra*. As such, Father's first, second, and third issues fail.

In his fourth issue, Father relies upon *In re S.S.W.*, 125 A.3d 413 (Pa. Super. 2014), in support of his contention that the orphans' court erred in failing to consider that Father defended himself without counsel in the PFA actions. In that case, we affirmed an order denying the petition for the involuntary termination of the father's parental rights to his children filed by the mother and stepfather. The orphans' court found that, as a result of incompetent counsel, the father in that case had "legitimately believed that he was bound by the PFA order and its contempt power to avoid any contact" with his children. *Id.* at 417 (citation omitted). This Court explained that the orphans' court found the father had "reached a low point in his life and attempted to fight his way out of it. To that end, [the f]ather sought psychiatric and spiritual counseling," and obtained job training and a steady

new job. He has been steady in paying his $400.00 per month support obligation." *Id.* at 417-418.

Likewise, in this case, Father argues that he legitimately believed the first PFA order prohibited him from contacting R.J.F. until it expired on May 29, 2017. Further, he argues that he exercised reasonable firmness to overcome the obstacles in maintaining his parent-child relationship with R.J.F. by complying with the March of 2015 *interim* custody order in obtaining a residence[8] and providing a mental health professional's opinion that his unsupervised physical contact with R.J.F. would not endanger her. Specifically, during the hearing, Father introduced into evidence a letter written by Jay M. Johnson, LCSW, from the Department of Psychiatry, Geisinger Health Systems, which stated that he met periodically with Father from January of 2014, through May of 2015. The letter continued as follows, in relevant part:

> I have not seen [Father] since his last therapy appointment in 2015. While it is true that [Father] had significant anger & impulse control issues, which have resulted in multiple inpatient admissions[,] I did not experience [Father] as a physically threatening or intimidating individual. . . . To my knowledge there were no incidents during the time that I was seeing [Father] that I suspected inappropriate or the potential for inappropriate interaction directed toward [R.J.F.] either verbally or behaviorally. His primary focus was to follow the conditions set forth by [CYS] so that he can fulfill his obligations/responsibilities of being a father. Again, let me be clear that I have had no contact with

---

[8] Father testified that he entered into a lease for his current residence in February of 2015, and that he "just renewed my lease to go another year." N.T., 3/30/17, at 56.

[Father] since May of 2015. The above remarks are based on my experience with [Father] during the above stated time[]frame.

Respondent's Exhibit 5. Based on Mr. Johnson's letter, we reject Father's contention that he attempted to comply with the last *interim* custody order in March of 2015. Indeed, on cross-examination, Father acknowledged that he had not seen Mr. Johnson in almost two years. N.T., 3/30/17, at 61. As such, we discern no abuse of discretion by the court to the extent it gave no weight to Mr. Johnson's letter in its termination decision.

Further, in contrast to *In re S.S.W.*, *supra*, there is no record evidence that Father "attempted to fight his way out of" the circumstances that gave rise to his limited custody award set forth in the September and December of 2014, and March of 2015, *interim* custody orders. Father neither continued therapy with Mr. Johnson nor received treatment from any other mental health professional after May of 2015, despite suffering a nervous breakdown in March or April of 2015, for which he was hospitalized. N.T., 3/30/17, at 73-74. In addition, Father testified that his only income is from Social Security disability.[9] *Id.* at 75. On cross-examination by the GAL, Father testified as follows:

---

[9] Maternal Grandfather testified that he filed a child support action against Father, but his request was denied because Father receives Social Security disability. N.T., 3/30/17, at 30. Further, Maternal Grandfather testified that he and Maternal Grandmother "provide everything for the child. . .", and that Father has never made any financial contribution to him for R.J.F.'s care. *Id.* at 16.

Q. [Y]ou said you get disability, what's the nature of your disability?

A. I am bipolar, I am ADHD, I have severe anxiety.

Q. But you don't take any medication for it?

A. No.

*Id.* at 74-75. On inquiry by the orphans' court, Father continued:

Q. Are you still seeing a doctor or do you check in with the doctor periodically?

A. No, sir.

Q. When is the last time you saw one?

A. Actually, the last time I s[aw] a doctor was when I was involuntarily committed.

*Id.* at 74-75. Because Father's mental health was an impediment to his custody of R.J.F., and he has not received treatment sine May of 2015, we conclude that Father's reliance upon *In re S.S.W.*, *supra*, is misplaced. Father's fourth issue fails.

In his fifth issue, Father argues that the orphans' court erred and abused its discretion when it determined that Father never attempted to benefit benefit R.J.F. economically. Specifically, Father argues that he "cannot be penalized for the . . . support determination" made by the Domestic Relations Office in denying Maternal Grandfather's request for child support. Father's brief at 31. Father's claim is without merit.

The orphans' court found that Father "paid no support for the child. He provided no economic benefit to the child. He deferred to [Maternal]

Grandparents to raise the child. . . ." Trial Court Opinion, 5/25/17, at 7. Upon review, the court's finding in this regard was not a determinative factor in its conclusion that Father refused or failed to perform his parental duties far in excess of the statutory six-month period. Rather, the court explained in its Rule 1925(a) opinion as follows.

> The court found that [Father] is not credible or reasonable for his failure to make any attempt to have contact with this child or provide any nurture to the child. In the [second] PFA order regarding the child, it was clearly stated in bold print that [F]ather could seek custody through the custody legal processes. . . .

Trial Court Opinion, 7/13/17, at 5. As discussed above, the orphans' court found Father not credible with respect to his testimony that he did not receive the second PFA order. Therefore, the court found that his lack of contact with R.J.F. since April of 2015, was not reasonable. As such, Father's fifth issue fails.

In his final issue, Father, without providing any relevant legal authority, argues that the orphans' court erred in terminating his parental rights because the trial court failed to consider that even though Mother voluntarily relinquished her parental rights to R.J.F, Mother "will continue to have regular access to" R.J.F. Father's Brief at 33. Father relies on ***In re Adoption of M.R.D.***, 145 A.3d 1117 (Pa. 2016), to support this claim of error. Such reliance is misplaced.

**M.R.D.** involved the interpretation of Section 2901 of the Adoption Act, which provides that "[u]nless the court for cause shown determines otherwise,

- 17 -

no decree of adoption shall be entered unless . . . parental rights have been terminated." 23 Pa.C.S. § 2901. **M.R.D.** does not address or even discuss 23 Pa.C.S. § 2511(a), which sets forth requirements for a petition to terminate parental rights. Since we are reviewing the disposition of Father's petition to terminate his parental rights, and not a petition for adoption, **M.R.D.** is irrelevant to our review of whether the trial court properly granted the termination petition.

Father bases this argument on the injustice he feels because he believes that, notwithstanding the voluntary relinquishment of her parental rights, Mother will still have contact with R.J.F. Father had the opportunity and responsibility to parent R.J.F. Father chose not do so. Father cannot now deprive R.J.F. of permanency because he believes that Mother will have contact with the Child. There is simply no legal basis for such a position.

Accordingly, we affirm the order involuntarily terminating Father's parental rights pursuant to Section 2511(a)(1) and (b).

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/1/2017

- 18 -