J-S19016-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF: C.M.H., A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: S.H., MOTHER, & M.S., STEPFATHER | : : : : : : : | No. 78 MDA 2024 |

Appeal from the Decree Entered January 3, 2024
In the Court of Common Pleas of Luzerne County Orphans' Court at
No(s): A-9521

BEFORE: DUBOW, J., BECK, J., and COLINS, J.[*]

MEMORANDUM BY BECK, J.:                **FILED: JULY 11, 2024**

S.H. ("Mother") and M.S. ("Stepfather") (collectively "Appellants")[1] appeal from the decree entered by the Luzerne County Orphans' Court ("orphans' court") denying Appellants' petition to terminate the parental rights of natural father, A.M.D.L.R. ("Father"), to C.M.H. ("Child"), born February 2016. Appellants argue that clear and convincing evidence established Father's parental rights should have been terminated pursuant 23 Pa.C.S. § 2511(a)(1) and (b). Upon review, we affirm.

The record reflects that Mother and Father were never married and, during their relationship, resided in Brooklyn, New York with Father's uncle.

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] We have amended the caption to reflect that both Mother and Stepfather jointly filed a notice of appeal.

The parties separated when Child was nine months old. Father moved out of his uncle's home; Mother continued to live there. Father attempted to file actions for custody and support in New York in 2017; however, he filed incorrect legal documents, including a petition for paternity despite the fact there was no dispute that he was Child's father.[2] Father also was unable to locate Mother to effectuate service, as Mother had moved out of his uncle's home.

Father did not have contact with Child again until he was two years old. In 2019, Mother moved to Luzerne County with Stepfather and Child.[3] Mother did not notify Father about the move. Subsequently, Mother informed Father that she had been diagnosed with stage 4 multiform glioblastoma, and Father spent time with Child on multiple occasions in 2020 while Mother received medical care in New York City. Mother estimates that Father saw Child six times in 2020. Thereafter, Mother sought financial support from Father for Child's care. For approximately one year, Father sent Mother $200 per month. On two occasions, she returned the money. In 2022, Father continued to see Child occasionally. In December 2022, Mother gave Father her Pennsylvania

_____

[2] The trial court noted that Father required the services of an interpreter as he is not a native English speaker and further observed that his limited ability to understand English, combined with lack of counsel, could have contributed to his filing incorrect documents. Orphans' Court Opinion, 2/21/2024, at 20-21.

[3] Appellants married in November 2022.

address for the first time. In 2023, Father communicated via text messages with Mother regarding Child and requested visits with Child or the ability to FaceTime with Child. Father indicated Mother would make excuses as to why he could not see Child. Father, however, called Child on his birthday in February 2023.

On June 19, 2023, Appellants filed a petition for involuntary termination of Father's parental rights, alleging Father had no contact with Child for the six months preceding the filing of the termination petition, failed to perform any parental duties for Child, failed to request any form of physical contact with Child—evidencing a settled purpose to relinquish his parental claim—and only sporadically asked Appellants about Child.[4] On July 24, 2023, Father filed a custody complaint in Pennsylvania. The parties reached an agreement as to Father's complaint, giving Father periods of partial custody of Child one time per week. Father comes from Brooklyn, New York to Luzerne County to exercise custody.[5]

---

[4] Appellants also indicated that Stepfather would adopt Child if Father's parental rights were terminated. *See* Petition, 6/19/2023, at 2 (unnumbered); *see also In re Adoption of M.R.D.*, 145 A.3d 1117, 1120 (Pa. 2016) (stating that a "petitioning parent must demonstrate that an adoption of the child is anticipated in order for the termination petition to be cognizable").

[5] Father lives in Brooklyn with his girlfriend and two other children. N.T., 12/14/2023, at 36-37.

In December 2023, the orphans' court held several hearings on Appellants' termination petition, wherein Mother, Father, and Stepfather testified.[6] The orphans' court ultimately denied the petition to involuntarily terminate Father's parental rights. The orphans' court found that Appellants did not establish by clear and convincing evidence that Father evidenced a settled purpose of relinquishing his parental claim to Child. Appellants filed a timely appeal and a concise statement of matters complained of on appeal pursuant to Pennsylvania Rule of Appellate Procedure 1925(b).

Appellants raise the following questions for our review:

A. Whether the [orphans'] court erred in denying [] Appellants' petition to terminate parental rights and/or abused its discretion with respect to [23 Pa.C.S. §] 2511(a)(1) of the Adoption Act?

B. Whether the [orphans'] court erred in denying [] Appellants' petition to terminate parental rights and/or abused its discretion with respect to [23 Pa.C.S. §] 2511(a)(2) of the Adoption Act?

C. Whether the trial court erred in denying [] Appellants' petition to terminate parental rights and/or abused its discretion with respect to [23 Pa.C.S. §] 2511(b) of the Adoption Act?

---

[6] The orphans' court appointed Attorney Masha Basco ("Attorney Basco") as counsel for Child. The orphans' court noted that Attorney Basco stated that was no conflict of interest in her ability to represent both the best and legal interests of Child. N.T., 12/11/2023, at 4; **see also In re Adoption of K.M.G.**, 240 A.3d 1218, 1235 (Pa. 2020) (stating that "where an orphans' court has appointed a [guardian ad litem]/[c]ounsel to represent both the child's best interests and legal interests, appellate courts should review sua sponte whether the orphans' court made a determination that those interests did not conflict").

Appellants' Brief at 3.

"In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence." *In re Adoption of C.M.*, 255 A.3d 343, 358 (Pa. 2021).

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record.  If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion.  A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.  The trial court's decision, however, should not be reversed merely because the record would support a different result.  We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re Adoption of B.G.S.*, 245 A.3d 700, 704 (Pa. Super. 2021) (citation omitted).

Termination of parental rights is governed by 23 Pa.C.S. § 2511, which requires a bifurcated analysis.  *C.M.*, 255 A.3d at 359.  "Initially, the focus is on the conduct of the parent.  The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in section 2511(a)."  *In re C.M.K.*, 203 A.3d 258, 261-62 (Pa. Super. 2019).  If the orphans' court determines the petitioner established grounds for termination under section 2511(a) by clear and convincing evidence, the court then must assess the petition under subsection 2511(b), which focuses on the child's needs and welfare.  *In re*

***T.S.M.***, 71 A.3d 251, 267 (Pa. 2013).   Clear and convincing evidence is evidence that is so "clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue."  ***In Int. of J.M.***, 166 A.3d 408, 423 (Pa. Super. 2017) (citation omitted).

Appellants initially sought to terminate Father's parental rights to Child pursuant to subsections (1) and (2).  However, Appellants abandoned their claim regarding subsection (2) and solely proceeded on subsection (1). Orphans' Court Opinion, 2/21/2024, at 18 (citing N.T., 12/28/2023, at 77). Therefore, we will address Appellants' claim regarding section 2511(a)(1).

Appellants argue that they established by clear and convincing evidence that Father evidenced a settled purpose of relinquishing his claim to Child. Appellants' Brief at 28, 30.  Appellants contend that Father never made himself part of Child's life or performed parental duties, highlighting that Father left when Child was nine months old and did not have contact with Child again until 2020; never attempted to come to Luzerne County after learning Mother had moved; never served the incorrect legal documents filed in New York on Mother; and only provided minimal child support starting in 2022, which was well below the child support guidelines in Pennsylvania.  ***Id.*** at 29-30, 32, 34; ***see also id.*** at 30 (noting although Father unsuccessfully filed a custody action in New York, he had no issues filing a custody petition in Pennsylvania in 2023).   Appellants further claim that in the six months prior to the

termination filing, Father did not seek to have contact with Child, and only sent a message in February 2023 to ask how Child was doing. *Id.* at 31. Appellants assert that Mother has never refused Father from contacting Child and would continue to allow Father to see Child even if his parental rights were terminated. *Id.* at 33. Appellants also argue that Father failed to provide any explanation for not seeking to obtain custody earlier, contending that, to the contrary, Father filed a paternity action seeking to state he was not the father of Child. *Id.* at 33-34. Appellants additionally emphasize the strong relationship between Child and Stepfather. *Id.* at 34.

Section 2511(a)(1) provides that termination is proper if "[t]he parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties." 23 Pa.C.S. § 2511(a)(1); *see also C.M.*, 255 A.3d at 363-64. "'Parental duties' are not defined in the Adoption Act." *In re Adoption of L.A.K.*, 265 A.3d 580, 592 (Pa. 2021). However,

> our courts long have interpreted parental duties in relation to the needs of a child, such as love, protection, guidance and support. Parental duties are carried out through affirmative actions that develop and maintain the parent-child relationship. The roster of such positive actions undoubtedly includes communication and association. The performance of parental duties requires that a parent exert himself to take and maintain a place of importance in the child's life.

*Id.* (citations and quotation marks omitted).

"When considering a request to terminate rights under [s]ection 2511(a)(1), a parent's failure or refusal to perform parental duties must be analyzed in relation to the particular circumstances of the case." *Id.* (citation and quotation marks omitted). "[T]he focus under [section] 2511(a)(1) is not the degree of success a parent may have had in reaching the child, but examines whether, under the circumstances, the parent has utilized all available resources to preserve the parent-child relationship." *C.M.*, 255 A.3d at 365.

> Even where the evidence clearly establishes a parent has failed to perform affirmative parental duties for a period in excess of six months, the court must examine the individual circumstances and any explanation offered by the parent to determine if that evidence, in light of the totality of circumstances, clearly warrants permitting the involuntary termination of parental rights.

*Id.* at 364 (citation, brackets, and quotation marks omitted). Moreover, in examining the totality of the circumstances, courts must consider a parent's post-abandonment contact, including a parent's efforts to "recultivate a parent-child relationship." *In re K.Z.S.*, 946 A.3d 753, 759 (Pa. Super. 2008) (citation omitted). Further, courts may "consider the whole history of a given case and not mechanically apply the six-month statutory provision, although it is the six months immediately preceding the filing of the petition that is most critical to the analysis." *C.M.*, 255 A.3d at 364 (citation, brackets, and quotation marks omitted).

In considering a non-custodial parent's explanation, courts must determine "whether a parent has faced barriers that prevented the parent

- 8 -

from maintaining the parent-child relationship." ***L.A.K.***, 265 A.3d at 593. "What constitutes a 'barrier' in the context of a [s]ection 2511(a)(1) analysis is a finding within the discretion of the trial court, and what may constitute a barrier necessarily will vary with the circumstances of each case." ***Id.*** "[O]bstructive behavior by the child's custodian presents a barrier to the parent's ability to perform parental duties, which mitigates the parent's failure to maintain the parent-child relationship." ***Id.***; ***see also C.M.***, 255 A.3d at 365 ("[O]bstructive behavior on the part of the custodial parent aimed at thwarting the other parent's maintenance of a parental relationship will not be tolerated, and certainly will not provide a sound basis for the involuntary termination of parental rights.") (citation omitted). "Fortitude is required, as a parent must act with 'reasonable firmness' to overcome obstacles that stand in the way of preserving a parent-child relationship and may not wait for a more suitable time to perform parental responsibilities." ***L.A.K.***, 265 A.3d at 592.

With these tenets in mind, we review the evidence presented at the hearings. Mother testified that she and Father were in a relationship until Child was nine months old, at which time Father moved out of the residence and she and Child lived with Father's uncle for an additional year. N.T., 12/11/2023, at 9-10, 29. Mother indicated Father did not maintain contact with Child after moving out and that he seemed uninterested in maintaining contact. ***Id.*** at 10, 30. Mother emphasized that she did not prohibit contact

between Father and Child. *Id.* at 11, 31. Mother testified that Father did not see Child again until he was two years old. *Id.* at 11-12. Mother stated that she moved to Luzerne County in 2019 with Stepfather, but admitted that she did not tell Father about the move. *Id.* at 16, 34-35. Mother did not know when Father became aware that she and Child had moved, but could not articulate a certain date that she gave Father her address in Luzerne County. *Id.* at 22-23. Mother testified that after her cancer diagnosis, Father met with Child on multiple occasions in 2020. *Id.* at 12-16, 31, 32. Mother indicated that Father did not have any physical contact with Child from 2020 until the filing of the termination petition. *Id.* at 8-9, 19; *see also id.* at 23 (noting that Father did not attempt to contact Child by phone in the six months preceding the filing of the termination petition). Mother testified that Father had her telephone number and that he only contacted her on occasion, including Child's birthday. *Id.* at 19-20, 35-36, 42. Mother indicated, however, she did not recall whether she responded to all of Father's texts or phone calls. *Id.* at 38. Mother testified that Father began paying $200 per month in child support in 2022. *Id.* at 20-22, 34. Mother acknowledged that Child has met Father's other children—his half-siblings—and that she would continue to permit Child to maintain his relationship with them. *Id.* at 48-49. Mother sought to terminate Father's parental rights because if something happened to her as a result of her cancer diagnosis, she was concerned that Father would attempt to take Child despite the lack of contact. *Id.* at 24-25.

Stepfather testified that he has been in a relationship with Mother since 2018, and that he and Mother moved to Luzerne County with Child in 2019. N.T., 12/14/2023, 4-5. Stepfather stated that Father did not know about the move until 2020. *Id.* at 28-29. Stepfather acknowledged that Father reached out to Mother by text messages to ask about visiting with Child, and subsequently had visits with Child in 2020 and 2022. *Id.* at 6-10, 21-22. Stepfather testified that Father began providing support in 2022. *Id.* at 22-23. Stepfather stated that Father would send texts about Child to Mother. *Id.* at 11. Stepfather emphasized that he considers Child his son and that he has taken care of him since he was a baby. *Id.* at 14; *see also id.* at 16 (stating that he financially supports Child).

Father testified that when he initially moved out of his uncle's residence in 2017, he did not talk to Mother about Child. *Id.* at 40-41. Father indicated that because he did not have contact with Mother, he initiated a case in New York in 2017 in an attempt to pay child support to Mother. *Id.* at 41; *see also* N.T., 12/28/2023, at 10-14, 35-36 (wherein Father explained that the State of New York indicated he could not get custody or pay child support without paternity being established, and that he did not seek to challenge his paternity). Father testified, however, that he was unable to serve Mother because he did not know where she lived. N.T., 12/14/2023, at 42; *see also* N.T., 12/28/2023, at 9-10 (Father stating that he asked his uncle where Mother lived, but could not find her address); *id.* at 16 (Father stating he

could not find Mother and could not hire a private investigator because he did not have money to pay for one). In 2018, Father refused Mother's request for her to have full custody of Child. N.T., 12/14/2023, at 42-43. Father testified that he repeatedly asked Mother to see Child between April 2018 and March 2019. *Id.* at 43. Father further stated that once he learned of Mother's cancer diagnosis, he offered to take care of Child. *Id.* at 44-45.

Father testified that he learned that Mother had moved to Luzerne County in 2021, but that Mother did not provide her address to him until December 2022. N.T., 12/28/2023, at 24; N.T., 12/14/2023, at 45. Upon learning she left the state, Father sought to file another action in New York, but he had been told that nothing could be done in New York because Mother lived in Pennsylvania. N.T., 12/14/2023, at 46. Father stated that he wanted to see Child, but Mother was never cooperative. *Id.*; *see also* N.T., 12/28/2023, at 6 (Father stating he looked for Child for a long time and Mother refused to give him access to Child). Father visited with Child in 2020, 2021, and 2022. N.T., 12/28/2023, at 15-16. Father also testified that Child has a positive relationship with his other children. N.T., 12/14/2023, at 54. Father further confirmed that he sent monthly child support payments to Mother from June 2022 until August 2023, but Mother sent the money back to Father two

of the months. *Id.* at 48-52.[7] Father indicated that he reached out to Mother via text messages in the six months preceding the filing of the termination petition in an attempt to see Child, but that she failed or refused to respond. N.T., 12/28/2023, at 35, 37; N.T., 12/14/2023, at 48, 58, 66. Father attempted to introduce texts from 2023, but acknowledged, on cross-examination, that the texts introduced in the record were from 2020. N.T., 12/28/2023, at 29-34. Father stated that Mother would come up with excuses for him not to see Child. *Id.* at 25; N.T., 12/14/2023, at 66. Father testified that he loves his son and does not believe it would be in Child's best interests to have his parental rights terminated. N.T., 12/28/2023, at 6-7.

The orphans' court provided the following explanation for denying Appellants' petition to terminate Father's parental rights:

> Although Father did not present evidence of text messages that occurred six months prior to the filing date of the petition to terminate his parental rights, Father was precluded from seeing [C]hild in the past by Mother. Mother, not only relocated from New York without telling Father, Mother refused to provide her address to Father until December 2022 when she finally did so. As a result of Mother relocating without Father's knowledge, Father was compelled to file an action in Pennsylvania since Mother was living with [C]hild in Pennsylvania in excess of three (3) years at the time he learned of her address and the whereabouts of [C]hild.
>
> Therefore, despite Father's lack of contact six months prior to the filing date of Mother's petition to terminate his parental rights, Mother did not have clean hands throughout the history of

_____

[7] Although Father stated that he had evidence of payments made between September and December 2023, he did not introduce this evidence at the hearing. N.T., 12/14/2023, at 49.

the case. Father made it clear that he was not able to file for custody and support in New York because he did not have Mother's address despite his attempt to learn it from investigation. Mother could have left her address with Father's uncle permitting Father to contact her regarding [Child]. Instead, Mother practically went into hiding, not notifying [F]ather where she was residing with [Child].

… Father stated that he reached out to the Mother several times [in the] six months prior to the filing date of the petition to terminate his parental rights, requesting to see [Child]. Father stated that when he filed an action in New York, he did not have counsel representing him. Father stated there was no hearing held by the court to address his petitions because he had to wait for Mother to file against him regarding support. Father stated that it was his understanding that he was not able to file on his own to pay her support because he was not legally married to Mother.

\* \* \*

[The orphans' court] finds Father's explanation for his lack of contact with [C]hild to be credible and reasonable. [The orphans' court] took into consideration the barriers which precluded Father from having contact with [Child], i.e., Mother's relocation from the State of New York to the Commonwealth of Pennsylvania; Mother refusing to give her home address to Father[,] thereby controlling Father's ability to contact [C]hild; and Father's inability to file legal documents in New York in 2017 in attempt to have custody of [C]hild or financially support [C]hild.

[The orphans' court] finds that [Appellants] did not present testimony or evidence that is clear, direct[,] and convincing so as to enable the [orphans' court] to come to a clear conviction, without hesitance, of the truth of the facts in issue in order to satisfy meeting the standard of clear and convincing evidence.

In light of Father having a reasonable explanation for not having contact with [Child] at least six (6) months prior to the filing of the petition to terminate his parental rights, the [orphans' court] need not address the post abandonment contact between parent and child or need not consider the effect of termination of parental rights on the child pursuant to [] 23 Pa.C.S.[] § 2511(b).

- 14 -

Orphans' Court Opinion, 2/21/2024, at 26-27, 28-29.

Based upon the orphans' court's credibility determinations, our review of the record supports its conclusions. Despite Father's prior absence in Child's life, Mother's obstructive behavior, meant to thwart Father's access to Child, mitigates Father's failure to maintain the parent-child relationship in the context of a section 2511(a)(1) analysis. Indeed, Mother took affirmative steps to block Father's ability to see Child by moving to Pennsylvania without informing Father, hindering his ability to ascertain her address until December 2022, and refusing to allow Father contact with Child without her approval. Father exercised diligence in attempting to overcome this obstructive behavior by repeatedly texting Mother to see and/or talk to Child, visiting Child when Mother allowed, and providing child support in the year up to and following the filing of the termination petition.

The record further reflects that Father attempted to gain custody of Child in New York, but failed to properly file the action, ostensibly because of the language barrier and lack of funds. *See **L.A.K.***, 265 A.3d at 594 (noting that "[i]t is crystal clear, and of vital importance . . . that a parent's legal efforts to enforce custodial rights demonstrate affirmative performance of a positive parental duty") (citation omitted); ***C.M.***, 255 A.3d at 367 (noting that "when undertaken in earnest to establish meaningful contact with a child who is otherwise withheld from access by the custodial parent, a noncustodial

parent's legal attempts to enforce custodial rights will usually be highly relevant evidence.").[8]

In light of the foregoing, we find no abuse of discretion in the orphans' court's conclusion that Appellants failed to present clear and convincing evidence that Father demonstrated a settled purpose of relinquishing his parental claim to Child or has refused or failed to perform parental duties for the six months immediately preceding the filing of the termination petition as required by section 2511(a)(1).[9] Accordingly, we conclude that the orphans' court's decree denying termination is supported by the competent evidence.

Decree affirmed.

---

[8] We note that we cannot consider Father's filing of a custody complaint in Pennsylvania on July 24, 2023, as it occurred after the filing of the termination petition. *See* 23 Pa.C.S. § 2511(b) ("With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition."); *see also* *C.M.*, 255 A.3d at 368 (stating that this Court is "cognizant of the duplicity enfranchised when a custodial parent's conduct both causes the need for legal intervention and faults the noncustodial parent for failing to take legal action more swiftly, and we are loath to require a parent's prosecution of legal proceedings as a mechanism for preserving parental rights").

[9] Because Appellants failed to prove by clear and convincing evidence that Father's parental rights should be terminated under section 2511(a), we need not discuss section 2511(b). *C.L.G.*, 956 A.2d at 1004 (noting that "[o]nly after determining that the parent's conduct warrants termination of his or her parental rights must the court engage in the second part of the analysis: determination of the needs and welfare of the child under the standard of best interests of the child") (citation omitted).

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary


Date: <u>07/11/2024</u>